[Cite as *In re Da.J.*, 2021-Ohio-3102.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE DA.J., ET AL.  
                        :  
                        :          No. 110393  
Minor Children  
                        :  
                        :  
[Appeal by T.C., Mother]        :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED  
**RELEASED AND JOURNALIZED:** September 9, 2021

Civil Appeal from the Cuyahoga County Court of Common Pleas  
Juvenile Division  
Case Nos. AD-17905453 and AD-18903971

*Appearances:*

Christina M. Joliat, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

LISA B. FORBES, J.:

{¶ 1} T.C. ("Mother") appeals the juvenile court's decision terminating her parental rights and awarding permanent custody of her two minor children, Da.J. and Dv.J. (collectively "the Children") to the Cuyahoga County Division of Child and Family Services ("CCDCFS"). After reviewing the law and pertinent facts of the case, we affirm.

## I. Procedural History

{¶ 2} Da.J. was born February 2, 2017 and Dv.J. was born December 27, 2017. CCDCFS became involved in April 2017, after an incident where Mother stabbed the Children's father ("Father") while he was holding Da.J. As a result, Da.J. was placed under the protective supervision of the agency. In December, Mother gave birth to Dv.J. CCDCFS moved to modify its protective supervision of Da.J. and filed a complaint for temporary custody of Dv.J. on March 26, 2018.

{¶ 3} CCDCFS was granted emergency temporary custody of the Children on May 31, 2018, following an incident where Mother and Father were arrested for shoplifting. The juvenile court granted CCDCFS temporary custody on April 1, 2019. Both Children had been continuously in CCDCFS's custody and in placements since May 31, 2018.

{¶ 4} On September 5, 2019, CCDCFS filed a motion seeking permanent custody of the Children. The court held a hearing on February 18, 2021. In two separate journal entries (one for each child), journalized March 11, 2021, the trial court awarded permanent custody to CCDCFS and terminated Mother's parental rights.[1] In each judgment entry, the trial court found that clear and convincing evidence had been presented demonstrating, under R.C. 2151.414(B)(1)(d), that each child had been in CCDCFS's custody for 12 or more months of a consecutive 22-month period. In addition, the trial court found that clear and convincing

---

[1] Journal entries were first journalized on March 3, 2021, however the juvenile court issued these two March 11 entries nunc pro tunc to fix a clerical error.

evidence had been presented establishing that granting CCDCFS's motion for permanent custody was in each of the Children's best interest under R.C. 2151.414(D). It is from these entries that Mother appeals.

## II. The February 18, 2021 Hearing

{¶ 5} At the February 18, 2021 disposition hearing, CCDCFS presented three witnesses: substance abuse counselor Ebony George ("George"), foster mother Lauren ("Lauren"), and CCDCFS caseworker Stacey Jackson ("Jackson"). The guardian ad litem for the Children, Sofia Teren (the "GAL"), submitted a written report prior to the hearing and also provided a recommendation on the record. In addition, 12 exhibits were entered into evidence without objection. The following testimony and information were presented at the hearing.

### A. Ebony George's Testimony

{¶ 6} George testified that she is a case manager and individual counselor at Moore Counseling, which is an "outpatient substance abuse [and] mental health treatment facility."

{¶ 7} Mother was one of George's clients in the phase-two intensive outpatient treatment program ("IOP"). According to George, Moore Counseling's drug and alcohol-abuse IOP consists of two phases. Phase one is "a six week program consisting of three to four days" of treatment per week. The goal is to rehabilitate participants and teach them coping mechanisms for "stressful situations, how to recognize their triggers, how to avoid triggers," and action plans to avoid relapse. Phase two is the aftercare portion of the program, which George

described as less intensive, consisting of only "one and a half hours for two days a week." In phase two, participants discuss topics such as: "triggers, recovery, negative influences, being able to avoid certain things, certain places, and things like that" through group and individual counseling. Throughout both phases, participants are required to submit regular urine drug screenings. If participants need help with transportation to drug screenings, Moore Counseling can provide them with bus passes. Participants are also required to provide proof of attendance at Alcoholics, Narcotics, and/or Marijuana Anonymous meetings throughout the program.

{¶ 8} Mother was recommended by CCDCFS to participate in Moore Counseling's IOP. George was not Mother's individual counselor for phase one but stated that Mother successfully completed phase one.

{¶ 9} Entering into phase two of IOP, George stated that Mother was on "two contracts," explaining that she was placed on a "behavioral contract" in phase one for attendance issues and a "last chance contract" for missing urine drug screenings. According to George, attendance issues can be a reason to place participants into contracts, but missed or positive drug screenings will place participants into "last chance contract[s]." George did not recall Mother ever requesting a bus pass to attend a required urine drug screening. Mother's phase one facilitator informed George that he had trouble communicating with Mother over the phone so George confirmed the phone number she had on file with Mother the first time they met in person for a drug screening.

**{¶ 10}** Due to of Mother's lack of attendance and lack of communication with Moore Counseling, George was never able to have an individual counseling session with Mother. They did have one appointment scheduled at the end of November 2020, but Mother did not show up. George recalled Mother attending approximately three group counseling sessions that were held via telephone.

**{¶ 11}** George testified that she was one of the signatories on Mother's discharge summary. Mother was discharged from Moore Counseling on December 21, 2020. George testified that she made several attempts to call Mother prior to her discharge from Moore Counseling. Mother did not answer, and her phone did not allow George to leave a voicemail message. When George could not reach her, George sent a "three-day letter" that informed Mother she needed to contact Moore Counseling within three days of receiving the letter to discuss continuing treatment and inform staff of any problems she may have been having leading to her noncompliance with the program. Mother violated her last chance contract "[b]ecause her attendance for the month of December" did not meet program requirements. "[S]he had only been in group three days, three times." Mother also missed urine drug screenings and had positive urine drug screenings. Mother's failure to respond to the three-day letter prompted her discharge from IOP.

**{¶ 12}** Upon being admitted to Moore Counseling, Mother's diagnoses were "alcohol use disorder severe, cannabis use disorder severe and hallucinogen use disorder severe." At the time of Mother's discharge, her diagnoses had not changed.

### B. Foster Mother Lauren's Testimony

{¶ 13} Lauren is the foster mother for both of the Children. Dv.J. was the first to move into her home on June 1, 2018, and has resided there since. Da.J. moved in on December 13, 2018, and has also resided there since.

{¶ 14} Lauren recalled that she was contacted on May 31, 2018, about taking in both of the Children. She explained that she was able to take both Children however, she was later informed that CCDCFS had "obtained a kinship placement" for Da.J. but that the kinship placement could not take Dv.J. because she was an infant. Da.J. stayed in the kinship placement until December 2018.

{¶ 15} Visitation throughout the case was set up by the CCDCFS caseworker. When Dv.J. first moved into Lauren's home, Mother was living at the Oriana House chemical-dependency treatment facility. Weekly visitation with Mother began around August 2018, at Oriana House. Lauren stated that she dropped Dv.J. off and did not stay for Mother's visitation. At that time, Da.J. was also being transported to Oriana House so that the siblings were able to see each other as well. That weekly visitation continued until October 2018, when Mother was released from the Oriana House.

{¶ 16} Lauren explained that visitation "was kind of inconsistent once it wasn't at the Oriana House." After Mother's release from the Oriana House "we didn't know where she was until Thanksgiving weekend * * *." Lauren recalled having one visit in late November 2018, at the Children's maternal grandmother's

house. After that visit, Mother's whereabouts again became unknown; Lauren did not know how to reach Mother.

{¶ 17} The next visit did not occur until February 2019. That visit was at the Children's maternal grandmother's house again. "[S]hortly after that the [grandmother] didn't want them visiting there anymore." According to Lauren, Father was not present at the last visit at the grandmother's house because he and Mother had a dispute prior to the visit and did not want to see each other. Lauren did not stay for the visits at the maternal grandmother's house but the Children's caseworker stayed for the visits. Once visits ceased at the grandmother's house, the Children visited Mother at the East Cleveland Library. They visited there until April 2019 when "visitation dropped off." Lauren later learned that Mother "had been in jail * * *." Lauren suggested visitation with Mother at the prison and the CCDCFS caseworker "said because of the charges it wasn't an option." Visitation did not resume until May 2020, following Mother's release from prison.

{¶ 18} Lauren reported that, while Mother was incarcerated, Father maintained inconsistent visitation. In 2019, she recalled having "maybe 10 visits throughout the year." On one visit in November 2019, Father told Lauren "that [Da.J.] was hitting him. So [she] kind of told [Da.J.] in the car when [Father] was putting him in the car, [she] said, * * * to [Da.J.] * * * we do not hurt people, you do not hit your father." Father did not attend another visitation until November 2020.

{¶ 19} Lauren stated that she believed Mother was released from prison in March 2020, however, that is when the COVID-19 pandemic began "[s]o there was

some time where we had to figure out what was going on, but we also had to be able to get in contact with her" and "by the time we were able to reach her or orchestrate visitation it was May 2020 * * *." Mother's visits in May 2020 remained in person and were held at either the East Cleveland Library or a fast-food restaurant. Lauren recalled that this visitation plan lasted for a little while until visits "dropped off for a little bit and then right before the last trial in October [Mother] requested visitation again." The Children had three in-person visits in October 2020. Visitation became inconsistent again "and then in December the County decided that we were going to stop in-person visitations and switch over to Zoom calls for safety purposes." Lauren recalled that "[m]ore often than not" there were periods where the Children's parents would not show up for scheduled in-person visitation for a month or so.

{¶ 20} In addition to in-person visitation, the Children also had Zoom calls with Mother in the summer of 2020. Those calls "were also inconsistent for various reasons. The mother wasn't able to get on. We would confirm a time and then it would either get canceled or they wouldn't show up to the call." The Zoom-call visitation became consistent in mid-December 2020 and remained consistent until the day of the hearing. However, while Mother was attending the Zoom call visits regularly, Lauren explained that she was "late sometimes as much as 40, 45 minutes on the call."

{¶ 21} There were times on the Zoom calls where Mother seemed frustrated "about the way the children were interacting but it was very developmentally appropriate for their age and given the bond. I think that there were just some

frustrations on the other end that they weren't more engaged or excited to see them or interested," which led to some yelling at the Children. Recalling comments like "[I'm] your mother * * * you don't even want to see [me] * * *." However, Lauren stated that the Children do "a really good job of just kind of shutting down and just playing with each other during that time." She tried separating the Children for Zoom visitation calls "to see if we could get a better interaction with their parents because Dv.J. will do what Da.J. does and Da.J. will do what she does and they have a great time together, but it's not great for interacting with other people." The Zoom calls lasted anywhere from 15 minutes to an hour depending on how late Mother was and the engagement of the Children.

{¶ 22} The last Zoom visit was held the day before the February 2021 disposition hearing. Lauren recalled the visit as "really hard." The Children did not want to engage, and Lauren had to keep carrying them back to the call. Lauren stated that "[t]he Zoom calls have not really had much of an effect on them." Dv.J. "does not want to get on the calls. She'll scream and cry beforehand, but once she sees * * * [Da.J.] do it first * * * then she's fine."

{¶ 23} Regarding the Children, Lauren stated that Da.J. "has some sensory issues and when he gets overstimulated or disregulated [sic] it's really hard to get him to calm down. He gets really hyper and sensory seeks. So he constantly like throws himself in the air and slams his body down or runs * * *." These behaviors happened frequently on phone calls for visitation. He has been diagnosed with "a social emotional delay and he is seen in occupational therapy for his sensory

processing issues." She explained that it takes a lot of patience and understanding to manage these issues and to ensure he continues to progress. Lauren also voiced concerns about his behavioral issues. She explained, "we had a whole year of really hardworking progress and just to see him slide back so quickly is kind of devastating." He attends an "inclusive preschool" and in 2020 Lauren started receiving frequent emails from his teacher about his behavior and "meltdowns."

{¶ 24} Dv.J. "is a very happy, content strong child." Lauren stated Dv.J. has been that way the entire time she has lived in her home. However, in December 2020 Lauren began noticing some concerning behaviors. "She started having trouble sleeping and she chewed all the noses off all of her stuffed animals. So when she would be laying in bed, I don't know for sure, but it seemed like an anxious tendency. She had never done that before." Lauren explained it as Dv.J. trying to "regulate herself." Dv.J. was in an early head start program that has halted due to the pandemic and has not required any other services.

{¶ 25} Lauren recalled some concerning behaviors with the Children after visitation, mentioning the November 2019 visit where Da.J. hit Father. Further, Lauren expressed concern because "the interactions on the phone calls were kind of negatively impacting the kids. Not always, but often and it was difficult to get them to want to engage or to focus on the phone call."

{¶ 26} The Children have lived together in Lauren's home since December 2018. Lauren explained that the Children "are very bonded now," because "they're

only 10 months apart * * * they're kind of like twins and they feed off of each other's emotions very easily * * *."

{¶ 27} Lauren explained that the Children know, to the extent that they can due to their ages, that Mother is their biological mother and that they "came from [her] and that they have a brother and a sister * * *." The Children's biological brother and sister are also not in Mother's custody; "the mother's grandmother has custody of the daughter[,] and the father's sister * * * has custody of the brother," she believes.

## C. Stacey Jackson's Testimony

{¶ 28} Jackson testified that she is a social worker for CCDCFS. Jackson began working as the Children's caseworker in approximately April 2020, after the Children had already been in CCDCFS's custody. When the case was transferred to her, she reviewed the information in CCDCFS's database to familiarize herself with the case. She also spoke to the previous caseworkers.

{¶ 29} Jackson gave testimony regarding Mother's two other children: a daughter, A.J., and a son, Am.J. Mother lost permanent custody for both of those children. The agency became involved with A.J. in 2014. Legal custody of A.J. was awarded to her grandmother after Mother was unsuccessful in completing the CCDCFS case plan, which included parent-education classes, substance-abuse treatment, mental-health services, domestic-violence services, and retaining adequate housing. At the time Mother lost permanent custody of A.J., she was "incarcerated awaiting trial." According to CCDCFS's complaint for dependency and

temporary custody of Am.J., Mother tested positive for marijuana when both A.J. and Am.J. were born. Mother had "used marijuana during her second and third trimester of pregnancy" with Am.J. The issues relating to the removal and subsequent loss of custody for A.J. and Am.J. were Mother's substance abuse, domestic violence with the children's father (the same Father of the Children at issue in this case), "mental health issues, anger management problems and criminal history * * *."

{¶ 30} Jackson testified that CCDCFS first became involved with Da.J. after an altercation with Mother and Father "where [Mother] stabbed [Father] while he was holding [Da.J.]." At that time, Da.J. was placed under CCDCFS's protective supervision to maintain "constant contact with the child and to make sure that he's safe."

{¶ 31} As a result of the stabbing incident, Mother pleaded guilty to domestic violence, endangering children, and assault. Jackson stated that Mother was placed on probation for those charges. In December 2018, while on probation, Mother gave birth to Dv.J. Jackson believed Mother tested positive for marijuana at Dv.J.'s birth. "[S]hortly after [Dv.J.] was born the parents were arrested for shoplifting which was a violation of [Mother's] probation from the domestic violence case." Mother did not have anyone to care for the Children upon her arrest so CCDCFS was notified. The Children were removed from Mother's custody of CCDCFS in May 2018, and temporary custody was awarded to CCDCFS.

{¶ 32} According to Jackson, Mother's case plan required her to attend "[p]arent education classes, domestic violence classes, substance abuse, drug and alcohol assessment for substance abuse and to acquire adequate stable housing for the children." The purpose for including domestic violence services in Mother's case plan was to "prevent domestic violence from continuing" in her relationship with Father.

{¶ 33} During the pendency of Mother's case with CCDCFS, she was arrested and had criminal issues twice, according to Jackson. The first time was shoplifting in May 2018 — the incident that led to CCDCFS's filing for temporary custody of the Children because Mother and Father did not have anyone to care for them. The second time, Mother plead guilty to "Felonious Assault on a Police Officer, Assault, and Child Endangering." Mother was sentenced to 12 months in prison on August 15, 2019. While Jackson did not work with Mother until after she was released from prison, Jackson acknowledged that Mother's incarceration "made it difficult to engage in services, but there were some services that were available to mom while she was incarcerated." While incarcerated, Mother had counseling, psychiatric evaluations, medication stabilization, and took a parenting class.

{¶ 34} After Jackson took over as the caseworker and after Mother was released from prison, she met with Mother on April 29, 2020. They met at Mother's mother's house and discussed "all the information about her case, why the [C]hildren were taken, the incident that happened between her and [Father], which led up to the later arrest." Mother told Jackson "that she would like to begin her

services at Moore Counseling because" the location was close to her home and it would be easy to go there since Mother did not have a car at that time. Jackson explained that Moore Counseling offered a lot of services that were part of Mother's case plan including parenting-education classes, domestic-violence classes, individual counseling, as well as drug and alcohol assessment services. Jackson recalled that Mother did not actually go to Moore Counseling until June 2020, but acknowledged that when they met in April, it was the beginning of the pandemic and "when we were first shutdown nothing was open. We didn't have anything virtual." Jackson reported checking in with Mother in April, May, June, July, August, September, and November 2020.

{¶ 35} Mother began domestic-violence services at Moore Counseling but stopped attending. Jackson estimated that around November 2020, Mother registered for domestic-violence services at Able Counseling. Jackson was not aware of why Mother stopped attending at Moore Counseling; however she recalled Mother explaining that she and Father "were going to work it out and stay together * * *." Despite registering for services at Able Counseling, Mother did not complete her domestic-violence services because Father never registered. Mother explained to Jackson that they had called and left messages, but Jackson instructed her to register online because that is where all the classes were held. When Jackson checked back in January 2021, Father still had not registered.

{¶ 36} Mother's case plan also included substance-abuse services. Jackson testified that Mother went for her first assessment at Moore Counseling in June

2020 where it was recommended that Mother go to an intensive outpatient program. Mother did not "actually start services until September." Jackson recalled that in June, Mother was "working and trying to find an apartment * * *." Prior to Jackson working on Mother's case, Mother had substance abuse referrals to Recovery Resources, Moore Counseling, and Signature Health. Jackson explained that Mother never completed the second step of substance-abuse services. "At some point she would complete one and then she would relapse, which would mean that she would have to start all over and then there would be a lapse in time."

{¶ 37} Mother's last sobriety date was when she was released from prison. Jackson testified that Mother tested positive for cocaine at her drug screening for the agency in September 2020. Jackson sent Mother to submit a urine drug screening every week during the 30 days prior to the hearing. Mother only attended two of those screenings; both were negative. At the time of the hearing, Jackson stated that she believed Mother "is still using in some capacity."

{¶ 38} Mother was required to do seven drug screenings for CCDCFS; however, she only completed four. Moore Counseling required its own screenings. Both Moore Counseling and CCDCFS reported positive drug screenings in 2020.

{¶ 39} Mother was also referred to Moore Counseling to address anger management concerns. Jackson was unaware if Mother ever engaged in any anger management courses.

{¶ 40} Mother's case plan also required mental-health services "[t]o stabilize her PTSD and her depression * * *." Jackson recalled Mother attending services

while she was incarcerated. After her release, Mother was going to "FrontLine to pick up her medication for her depression and her PTSD." "There was only one time during the case where mom wasn't on her depression medicine." Jackson reported that Mother sought individual counseling at Moore Counseling for her mental health, but was discharged from Moore Counseling's program before she started. Jackson's assessment of Mother's mental health was that Mother was maintaining because she continued to take her medication.

{¶ 41} Finally, Mother's case plan required her to obtain adequate housing. At the time of the hearing, Mother lived in her mother's basement with Father, where she has lived since Jackson became the caseworker in April 2020. Jackson described the house as a two-bedroom home with five occupants, three adults and two children, aged six and eight. While Jackson admitted that she did not ever personally view the basement, she stated that she did not consider this housing arrangement appropriate because "[t]here isn't enough room to accommodate" the Children. According to Jackson, when Mother's mother was asked by CCDCFS whether the Children could stay there if Mother was given custody, "she had said no."

{¶ 42} Jackson believed that Mother had not "been able to obtain housing" despite Mother applying to various housing authorities, noting that Mother's felony conviction is a barrier. When Mother was released from prison, Jackson called "Rainbow Terrace Apartment * * * and spoke with the leasing agent and she had invited mom to come in and fill out an application." Jackson was unaware whether

Mother did so.  Additionally, Jackson gave Mother a contact person with a homeless shelter explaining "all mom had to do at that time was show up and they were going to allow her in, but she didn't go."  The last time Jackson and Mother discussed employment, Mother reported that she "was working for a packaging company through a temp agency."  However, at the time of the hearing Jackson had not seen documentation confirming that Mother was presently employed.

{¶ 43} Jackson testified regarding Mother's visitation with the Children. Jackson described Mother's visitation since April 2020 "[a]s consistent as she could be," recalling a few times that Mother could not be reached for scheduled visits and between "five and six times" where Mother ended the visit early or cancelled. Mother's first visit after release from prison was in May 2020.  Because of COVID

> we did a Zoom visit and that was the first time that mom had seen her baby since April of 2019.  It was very emotional for mom.  We ended up ending the call early because mom was in tears.  I think it was devastating for her to see how much her children had grown in the time that she had been away and so we didn't do Zoom visits for the month of June.  Mom was focusing on working and she was out looking for an apartment and she was just doing everything else that she could.

{¶ 44} Mother was offered Zoom visits in June but she stated "she wanted to concentrate on housing and getting a job."  In July or August 2020, Mother began visiting the Children in person "at the Euclid Library and those visits went great." Mother played with the Children, and she "interacted with the kids.  They played on the monkey bars, they swung on the swings, the jungle gym.  It was something out of a story book.  They had a wonderful time."  One visit in October 2020, Mother ended the visit early after becoming "very upset and emotional."  Jackson recalled it

was right before going to trial and Mother told her "I'm probably not going see them anymore any way * * *" and ended the three-hour visit after only an hour. CCDCFS discontinued in-person visitation in November or December due to the pandemic and switched to Zoom. Jackson described the switch as "very hard. It's hard to engage the children and we tried many different things during the Zoom visits even to the point of separating the children." Jackson felt as though "the parents took it personal that the children weren't engaging with them." As the caseworker, Jackson described having to do her visits with the Children via Zoom as well and "I have to lead it. I have to initiate it. I have to do it. It's challenging, but it's able to be done." She also noted that Mother was usually late for the Zoom visits.

{¶ 45} Jackson recalled that Mother had a flip phone that interfered with her ability to attend Zoom hearings. However, when Mother needed her to, Jackson would go to Mother's house and let Mother use her work phone for Zoom call visitation.

{¶ 46} CCDCFS looked into possible family placements for the Children; however, no one was identified who could care for them. The agency looked into Father's sister and Mother's mother. Both relatives are already caring for one of Mother's other children, and both said they could not take the Children. Jackson explained that neither Mother nor Father was able to identify any other possible suitable family members to care for the Children.

{¶ 47} In Jackson's opinion, granting permanent custody to CCDCFS is in the Children's best interest because Mother has not demonstrated a change in her

behavior "where I would feel that the children would be safe and cared for" in her care. Mother did not finish a drug and alcohol outpatient program, she does not have adequate permanent housing for the Children, and she is still in a relationship with Father "without the benefit of any counseling for the domestic violen[ce] issues between the two of them." Jackson stated that she had concerns about Mother and Father being together because "they would have physical altercations between each other."

### D. The GAL's Testimony

{¶ 48} The GAL filed a written report and reiterated the contents of that report on the record at the hearing. The GAL became involved with the Children in this case in April 2017; the case had been ongoing for roughly four years at the time of the hearing. She recommended granting permanent custody of the Children to CCDCFS, explaining, "I do believe that children should stay" in their current placement.

{¶ 49} The GAL recalled that Mother had not been "engaged" throughout much of the case. However, while in the foster home, "the [C]hildren were receiving all the care that they needed" and any challenges the Children faced were "addressed beyond and above" what was needed.

{¶ 50} In the foster home a "bond was created between the children and the foster mom and the foster parents and there [are] also two other siblings. And the last time I saw the children they interact[ed] with each other as one united family.

They recognize that they have siblings in the house.  They recognize that the foster parents are their parents."

{¶ 51} The GAL testified regarding two issues relating to Mother that made her believe that custody of the Children should not restored to her.

{¶ 52} First, the GAL described Mother's lifestyle as "transient."  Explaining that she served as GAL for Mother's other two children, A.J. and Am.J., in that permanent custody proceeding, the GAL testified:

> I have been involved since 2014.  * * * I do believe that [Mother] had a lot of time to just do the right thing and unfortunately, that didn't happen.  I cannot see these children leaving this foster home at the age of three and four and just be okay with it and just move them back with parents that are practically strangers to these two children.

{¶ 53} Second, she discussed Mother's criminal record, and explained:

> Mother has three felonies in Cuyahoga County and multiple misdemeanors in Cleveland Municipal Court that involve public intoxication, disorderly conduct, * * * misconduct in the public transport, et cetera.  She's been in and out as well for probation violations.

The GAL concluded that these behaviors were concerning because they meant that there was "not a stable environment that you want children to be in and as the Guardian ad Litem I cannot see that these children can be moved to these parents and then the parents will continue this type of behavior and lifestyle."

## III.  Standard of Review — Permanent Custody

{¶ 54} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence."  *In re M.J.*, 8th Dist. Cuyahoga

No. 100071, 2013-Ohio-5440, ¶ 24. "Where clear and convincing proof is required at trial, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof." (Citations omitted.) *In re V.S.,* 8th Dist. Cuyahoga No. 109966, 2021-Ohio-1818, ¶ 27.

{¶ 55} "Courts apply a two-pronged test when ruling on permanent custody motions." *In re De.D.,* 8th Dist. Cuyahoga No. 108760, 2020-Ohio-906, ¶ 16. To grant the motion, courts first must find that any of the factors in R.C. 2151.414(B)(1)(a)-(e) apply, or that (B)(2) applies. *Id.* "Second, courts must determine that terminating parental rights and granting permanent custody to the agency is in the best interest of the child or children using the factors in R.C. 2151.414(D)." *Id.*

## IV. Law and Analysis

### A. First Assignment of Error

{¶ 56} In Mother's first and only assignment of error, she argues that the trial court's decision terminating her parental rights is not supported by sufficient evidence, is against the manifest weight of the evidence, and is not in the best interest of the Children. Upon review of all of the testimony and evidence presented in the case at bar, we find that the juvenile court's decision terminating Mother's parental rights was supported by clear and convincing evidence to support each of the essential statutory elements and was not arbitrary, unreasonable, or capricious.

### 1. R.C. 2151.414(B)(1) Factors

{¶ 57} Under the two-prong analysis, the court first decides whether any of the conditions under R.C. 2151.414(B)(1) or (2) apply. If any of the conditions identified in subsection (1)(a)-(e) apply, that provision has been satisfied.

{¶ 58} Here, the juvenile court made findings for each child under subsection (B)(1)(d), finding that each of the Children is "not abandoned or orphaned but has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period." "For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." R.C. 2151.414.

{¶ 59} Here, for purposes of (B)(1), the Children are considered to have entered temporary custody of CCDCFS on July 30, 2018. Both of the Children were removed from their home with Mother and placed in CCDCFS's emergency temporary custody on May 31, 2018, as reflected in journal entries submitted into evidence as exhibits, and testimony from Lauren, Jackson, and the GAL. Sixty days after that date is July 30, 2018, which is, obviously, earlier than April 1, 2019, when the court issued its journal entry granting temporary custody to the agency pursuant to R.C. 2151.28.

**{¶ 60}** CCDCFS filed its motion for permanent custody on September 5, 2019. Evidence in the record established that, for purposes of the statute, the Children had been in CCDCFS's custody just over 13 months at the time CCDCFS filed its motion for permanent custody. Clear and convincing evidence supported the trial court's finding under (B)(1)(d).

### 2. R.C. 2151.414(E) Factors

**{¶ 61}** Having found that the Children had been in CCDCFS's custody for "twelve or more months of a consecutive twenty-two month period" under 2151.414(B)(1)(d), the trial court was not required to make findings under subsection (E). Nevertheless, the court did make an additional finding in that the Children "cannot be placed with one of the child's parents within a reasonable period of time or should not be placed with either parent" and also made findings consistent with several (E) subsections.

**{¶ 62}** Under subsection (E)(1), for each of the Children, the court found that Mother "has failed continuously and repeatedly to substantially remedy the conditions causing the [Children] to be placed outside the [Children's] home."

**{¶ 63}** Under subsection (E)(5), for each of the Children, the court found that "[t]he parent is incarcerated for an offense committed against the child or a sibling of the child."

**{¶ 64}** Under subsections (E)(6) and (E)(7), for each of the Children, the court found that Mother "has been convicted of or pleaded guilty to an offense listed in ORC §2151.4141(E)(6) or §2151.414(E)(7)."

{¶ 65} Under subsection (E)(9), for each of the Children, the court found that Mother

> has placed the [Children] at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the [Children] or an order was issued by any other court requiring treatment of the parent.

{¶ 66} Under subsections (E)(4) and (14), for each of the Children, the court found that Mother "has been unable to provide shelter, and other basic necessities for the child or to prevent the child from suffering abuse."

{¶ 67} Under subsection (E)(15), for each of the Children, the court found that Mother "has caused or allowed the [Children] to suffer neglect and the Court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the [Children's] placement with the [Children's] parent a threat to the [Children's] safety."

{¶ 68} Upon review, we do not find evidence in the record that either Mother or Father is presently incarcerated for an offense committed against the child or a sibling consistent with the trial court's finding under subsection (E)(5). While Mother was previously incarcerated for an offense against a sibling of the Children, A.J., she was not incarcerated at the time of the hearing. This one erroneous finding does not affect the other findings of the court or the ultimate disposition of the case.

{¶ 69} Each of the remaining subsection (E) findings is supported by clear and convincing evidence in the record. Mother and Father were engaged in a

domestic violence incident where Mother stabbed Father while he was holding Da.J. Mother and Father were subsequently arrested for another crime with no one available to care for the Children. Admitted into evidence was a journal entry that Mother pleaded guilty to violating R.C. 2919.22(A), 2919.25, and 2903.11, which are listed offenses under subsection (E)(6) and (E)(7).

{¶ 70} When the agency was granted temporary custody of the Children, a case plan was established to address Mother's alcohol and substance abuse, domestic violence, parenting, mental health, and housing. While the court did hear testimony that Jackson had no concerns with Mother's progress on her parenting and mental-health services, testimony was also presented regarding Mother's failure on several other required services.

{¶ 71} Testimony was given that Mother was incarcerated for 12 months while the Children were in CCDCFS's custody halting some progress on her case plan. The trial court heard testimony regarding Mother's lack of diligent work on the case plan before and after incarceration including positive drug screenings, missed drug screenings, repeated absences from substance abuse counseling, discharge from the substance abuse program, inconsistent visitation with the Children, and not engaging with domestic violence classes. The court also heard testimony about Mother's issue with domestic violence with Father and their continued relationship with each other without attending domestic violence services. Further, at the time of the hearing, Mother was living in the basement of her mother's house. That house only has two bedrooms and five occupants. The

court heard testimony from Jackson that this was not a suitable living arrangement for the Children.

{¶ 72} In conclusion, the evidence in the record supports the trial court's findings.

### 3. R.C. 2151.414(D) and (D)(2) Best-Interest Factors

{¶ 73} Having found that clear and convincing evidence had been presented on the R.C. 2151.414(B)(1)(d) factor, the juvenile court turned to assessing whether an award of permanent custody to the agency would be in the best interest of the Children. The juvenile court made findings consistent with granting permanent custody under both R.C. 2151.414(D)(1) and (D)(2).

{¶ 74} In considering whether the grant of permanent custody of the Children was in each child's best interest, the court considered the following R.C. 2151.414(D)(1) factors.

{¶ 75} Under subsection (a) "the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster parents."

{¶ 76} Under subsection (c) "the custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period."

{¶ 77} Under subsection (d) "the child's need for a legally secure permanent placement."

{¶ 78} Under subsection (e) "whether that type of placement can be achieved without a grant of permanent custody."

{¶ 79} Additionally, the court considered the age of the Children and the GAL report.

{¶ 80} In considering all of those factors, the court found for each of the Children "by clear and convincing evidence that a grant of permanent custody is in the best interests of the child and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent." This finding is consistent with each of the court's considerations and is supported by testimony from George, Lauren, Jackson, and the report of the GAL. Lauren and the GAL testified that the Children have a good and strong relationship with the foster family. While Jackson testified that the Children did have a good bond with Mother, she was unable to provide a secure permanent placement due to her recurring substance abuse and lack of adequate housing.

{¶ 81} Turning to R.C. 2151.414(D)(2), if all four of its subsections apply, "permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency." The trial court analyzed the evidence in relation to each of the four subsections and found that permanent custody was in the Children's best interest.

{¶ 82} Subsection (a) looks to whether one or more of the factors in division (E) of R.C. 2151.414 exist "and that the child cannot be placed with one of the child's

parents within a reasonable time or should not be placed with either parent." As addressed, the juvenile court found that evidence had been presented supporting seven of the division (E) factors and our review affirmed the trial court's analysis that the Children cannot or should not be placed with one of the child's parents within a reasonable time.

{¶ 83} Subsection (b) directed the juvenile court to determine if the Children had been in agency custody for two years or longer and, therefore, no longer qualified for temporary custody pursuant to R.C. 2151.415(D). R.C. 2151.415(D)(4) states:

> the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section.

Here, the juvenile court found that the Children had been in agency custody for over two years at the time it entered judgment. CCDCFS filed a complaint for temporary custody for Dv.J. and moved the court to modify protective supervision to temporary custody of Da.J. on March 26, 2018. The Children had been in CCDCFS's emergency temporary custody since May 31, 2018. Following the hearing on CCDCFS's motion for permanent custody, judgment was entered awarding permanent custody to CCDCFS on March 4, 2021. Therefore, the juvenile court properly concluded that the Children had been in agency custody for over two years and no longer qualified for temporary custody.

{¶ 84} Subsection (c) directed the court to determine if the child did not meet the requirements for a planned permanent living arrangement pursuant to R.C. 2151.353(A)(5). If they do not meet the requirements, then this element is satisfied. Here, CCDCFS did not request for the Children to be placed in a planned permanent living arrangement and there is no evidence that any of the statutory requirements were met.

{¶ 85} Finally, subsection (d) directed the court to determine whether, "prior to the dispositional hearing, no relative or other interested person has filed or been identified in a motion for legal custody of the child." The record does not indicate any such motion was filed. Further, testimony at the hearing supports the court's finding. Jackson testified that CCDCFS had looked into several family members, but no one was deemed suitable for placement.

{¶ 86} Therefore, because the evidence presented at the hearing supported all four subsections of (D)(2), the juvenile court was required to find that CCDCFS's motion for permanent custody is in the Children's best interest.

{¶ 87} In reviewing permanent custody proceedings, we are mindful that "the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation cannot be conveyed to a reviewing court by printed record." *Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952). This court has additionally held that the "discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child

should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994).

{¶ 88} Accordingly, we find the court acted within its discretion, as shown by clear and convincing evidence in the record, when it terminated Mother's parental rights and granted custody of Da.J. and Dv.J. to CCDCFS. Mother's sole assignment of error is overruled.

{¶ 89} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
MICHELLE J. SHEEHAN, J., CONCUR